**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 19-361 (BAH) |
| KOFI APPIAH, and | Chief Judge Beryl A. Howell |
| JAMES HUTCHINGS, JR., | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

The defendants, Kofi Appiah and James Hutchings, Jr., are each charged with a single count of conspiracy to commit an offense or to defraud the United States, in violation of 18 U.S.C. § 371. Indictment, ECF No. 1. The government alleges that over a period of almost four months, from September 4, 2018 through December 19, 2018, the defendants conspired to purchase firearms in Georgia for illegal sale to prohibited individuals in the Washington, D.C. area. *Id*. at 3–6. To bolster its case, the government seeks to introduce in its case-in-chief, pursuant to Federal Rule of Criminal Procedure 404(b), Hutchings's text messages recovered from the phone of his fiancée. Gov't Mot. Regarding Rule 404(b) and 609 at 43–44 ("Gov't Mot."), ECF No. 47. Moreover, should Hutchings decide to testify at trial, the government seeks to introduce evidence of two of his prior convictions, under Federal Rule of Evidence 609, in order to undermine his credibility. *Id*. at 44–47. Hutchings opposes the admission of the text messages and both of his prior convictions, arguing admission of the former would contravene Federal Rules of Evidence 404(b) and 403, while admission of the latter would violate Rule 403.

Def. Hutchings's Opp'n to Gov't Mot. ("Def.'s Opp'n") at 2, ECF No. 53.  For the reasons

explained below, the government's evidence will be admitted.[1]

## I.      BACKGROUND

### A.      Government's Proffered Factual Background

The government has proffered the following facts as underlying the instant conspiracy

charge against each defendant.  On December 19, 2018, during execution of a search warrant at

the home of Linwood Thorne at 4215 Foote St. NE in Northeast Washington, D.C., the FBI

recovered almost 100 pounds of heroin laced with fentanyl, 50 pounds of marijuana, and, most

pertinent to this case, 6 firearms.  Gov't Mot. at 2–3.[2]  When the Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF") examined the recovered firearms, it determined that three of

them—a Glock 43, 9mm pistol and two Glock 19, 9mm pistols—had been purchased by

defendant Appiah and an associate on September 4, 2018 and December 6, 2018, from a firearms

dealer in Columbus, Georgia.[3]  That certain guns wound up alongside a large cache of illicit

drugs in Washington, D.C. less than two weeks after their purchase in Georgia prompted further

investigation.

On February 21, 2019, law enforcement contacted defendant Appiah and his associate,

who, agents had determined, were members of the U.S. Army stationed at Fort Benning,

---

[1]      As summarized, *infra*, in Part I.C, other defense motions have been resolved orally at a hearing on June 5, 2020 and Hutchings's suppression motion remains pending.

[2]      Thorne is currently facing numerous charges in another case before this Court.  *See United States v. Thorne*, 18-cr-389 (BAH), 2020 WL 122985 (D.D.C. Jan. 10, 2020).

[3]      The record is murky as to when each of the three guns was purchased.  The government asserts that "of [the] three firearms, two were originally purchased by Appiah and the third was purchased by Appiah's associate, on behalf of Appiah."  Gov't Mot. at 3.  The government then explains that "the three firearms in question were purchased on September 4, 2018 and December 6, 2018, respectively," suggesting that the two firearms directly purchased by defendant Appiah were purchased on September 4, 2018, while his associate purchased the third on December 6, 2019.  *Id*.  In the next sentence, however, the governments states that "the records revealed that on December 6, 2018, Appiah and the third-party purchaser purchased multiple firearms at a firearms dealer in Columbus, Georgia, and within thirteen days, three of those firearms ended up in Thorne's residence."  *Id*. at 3–4 (footnote omitted).  Still later, the government asserts that "Appiah purchased two Glock pistols" on December 6, 2018.  *Id*. at 20.

Georgia.  *Id*. at 4.  Both admitted purchasing the weapons in question, and Appiah admitted that his associate had done so at his direction.  *Id*.  Appiah maintained, however, that he had not sold the firearms, but merely asked an acquaintance, whom he called "Bo," to help him move the guns and some of his other belongings from Georgia to the Washington, D.C. area, where his girlfriend and family resided.  *Id*. at 5.

When pressed for information about how his firearms ended up at the Foote Street residence, Appiah eventually replied, "I sent Bo up to D.C. with more guns than what was in the news clip."  *Id*.  The interviewers were confused by Appiah's mention of a "news clip," but he explained that "[a]n unknown number" had sent him a news report about the December 19, 2018 search of Thorne's residence.  Although the article described the seizure of firearms and narcotics, it nowhere mentioned Appiah's name, the models of the recovered firearms, nor any other information that would connect Appiah to the seizure.  *Id*.  Explaining how he determined that the seized weapons mentioned in the article were the same ones he sent to D.C. with "Bo," Appiah merely stated, "I know that I have Glocks."  *Id*.  He further told agents he owned approximately 20 guns, which, apart from those recovered at the Foote Street residence, were stored at his home in Georgia, his girlfriend's home in Washington, D.C., and his family's home in Maryland.  *Id*. at 7.  When law enforcement executed a search warrant at Appiah's girlfriend's D.C. home that same day, however, no guns were found.  *Id*.

Over the next few months, investigators attempted to verify the location of all of Appiah's firearms, with only limited success.  For instance, on February 26, 2020, an ATF agent and an Army investigator visited Appiah at his apartment in Columbus, Georgia, and Appiah consented to a search for firearms.  *Id*. at 7–8.  In fact, he helped, pulling four gun boxes from under the bed containing a Glock 43, a Glock 22, a Smith & Wesson M&P, and a Springfield

1911.  *Id.* at 8.  Law enforcement agents have determined from records searches that Appiah had purchased at least five guns in addition to the ones found under his bed on February 26, 2019, but when asked about their location, Appiah said they were in Maryland or D.C.  *Id.*  He agreed to show those weapons to agents in the D.C. area when he was next on leave, but he never did. *Id.* at 8–10.

Eventually, pursuant to a warrant, law enforcement obtained records of cell-site data for Appiah's phone.  *Id.* at 10.  With this data, agents were able to analyze the general location of Appiah's phone on various dates, with illuminating results.  On December 7, 2018, the day after some of the firearms recovered at the Foote St. residence had been purchased, the phone traveled from Atlanta, Georgia to Arlington, Virginia and returned to Georgia two days later, on December 9, 2018.  *Id.*  With this information in hand, law enforcement confirmed that Appiah took a Delta Airlines flight on December 7, 2018, and, more importantly, declared that his luggage contained "shooting equipment."  *Id.* at 10–11.  He did not declare any "shooting equipment" when he returned two days later.  *Id.* at 11.  During this brief visit to the D.C. area, moreover, Appiah's phone connected to a cell tower in close proximity to both an auto-body shop owned by Thorne and another tower near Thorne's Foote St. residence.  *Id.*

On June 12, 2019, agents again spoke with Appiah in Fort Benning, Georgia, this time with a warrant for his cell phone in hand.  *Id.*  As the contents of his phone were being downloaded, Appiah responded to questions and denied ever having visited the Foote St. residence but explained that he had family in the area of Thorne's auto-body shop.  *Id.* at 11–12. He also stated that he traveled to D.C. "approximately every two weeks," and that he had been transporting his firearms to D.C. because he was planning to leave the military and preparing to move to D.C.  *Id.* at 12.  When agents again tried to pin down where those firearms were, Appiah

stated that after investigators had interviewed him in February, 2019, he "got scared" and "asked his friends to destroy and throw his firearms away" in an effort to "downsize[] his collection." *Id.*  Asked for more information about his associate "Bo," Appiah refused, but muttered "[r]ats should be exterminated."  *Id.*

Review of the contents of Appiah's phone turned up many images of firearms and text messages indicating that Appiah was engaged in the sale of firearms as late as June, 2019, several months after law enforcement had first interviewed him.  *Id.* at 13–18.  Most relevant to this case, the phone contained images of at least one of the firearms recovered from the Foote St. residence.  *Id.* at 18 n.5.

At this point, while law enforcement was relatively confident that Appiah had purchased weapons in Georgia and sold them to individuals in the D.C. area, the connection between Thorne and Appiah was elusive.  *Id.* at 18.  This piece fell into place when agents investigating Appiah consulted with agents investigating Thorne.  *Id.*  The Thorne team explained that, when Thorne was arrested on January 3, 2019—two weeks after execution of the search warrant at Thorne's Foote Street residence—agents were surveilling a Baltimore apartment where Thorne was believed to be hiding.  *Id.*  Agents witnessed Hutchings leave the apartment with another individual and get into a car, which the agents then pulled over to question both about whether Thorne was in the apartment.  *Id.* at 18–19; Rough Transcript of Hearing (June 5, 2020) ("Hr'g Tr. (Rough)") at 55:10–25.  The individual with Hutchings confirmed that Thorne was in the apartment.  Gov't Mot. at 19.  Law enforcement left Hutchings and the other individual, entered the apartment, and found Thorne with four cell phones, which the government asserts were all on Thorne's person or in close proximity.  *Id.*

According to the government, one of the seized phones was later discovered to belong to Hutchings.[4]  On July 5, 2019, agents secured access to the phone pursuant to a search warrant and uncovered evidence that Hutchings was the connection between Appiah and Thorne.  *Id*. at 19–20.  Specifically, agents recovered several text messages between Appiah and Hutchings apparently referring to the very guns later found in Thorne's Foote Street apartment.  For instance, on November 13, 2018, Appiah sent Hutchings a photo of a Ruger .38 revolver and an AR-15 style rifle, and, two days later, Hutchings responded saying "I'm in Atlanta bro. I need some of them."  *Id*. at 20.  Appiah indicated that those two weapons had already been sold, but informed Hutchings that "Next month is a go."  *Id*.  Hutchings replied, "I will be here next month to pick up my order."  *Id*. at 21.  On November 30, 2018, Appiah sent Hutchings another photograph, this time listing what appear to be prices for various firearms, magazines, and ammunition.  *Id*.  Notably, the image listed "43's" for "459/each" and "19's" for "500/each."  *Id*. A few hours later, Hutchings sent Appiah a screenshot showing that $1,500 had been transferred to Appiah's account on CashApp, a mobile app through which users can complete financial transactions.  *Id*. at 21–22.  "Got it," Appiah replied.  *Id*. at 22.  Text messages from Hutchings to Appiah, on December 1 and 3, 2018, show two more CashApp transfers of $410 and $310, respectively.  *Id*.  On December 4, 2018, Appiah sent Hutchings a text stating "These are the 23's" and attached a photograph of two pistols lying in gun boxes with two magazines each.  *Id*. The next day, the phone was used to conduct an internet search for the phrase "can fbi get images off cellphone."  *Id*. at 23.  On December 6, 2018, Hutchings sent Appiah a final screenshot showing a $430 CashApp transfer to Appiah's account.  *Id*.  at 22.  Appiah replied

---

[4]     This phone is currently the subject of Hutchings's suppression motion, for which a hearing is scheduled on August 14, 2020. *See* Def. James Hutchings's Mot. to Suppress Evidence, ECF No. 50; Min. Order (May 20, 2020).

"Cool.  We linking up Friday or Saturday."  *Id*.  Hutchings responded, "Friday if possible."  *Id*.
As noted already, Appiah was on his way to the D.C. area the next day.

GPS data retrieved from Hutchings's phone also bolstered the Appiah-Hutchings-Thorne
connection.  On December 8, 2018, Hutchings's phone was in close proximity to Appiah's
parents' residence in Temple Hills, Maryland, and on December 9, 2018, the phone was "within
blocks" of Thorne's Foote St. residence.  *Id*. at 23.  On December 11, 2018, Hutchings texted
Appiah "Thank you bro I'm going see [sic] big bro in about the next hour or so," and less than an
hour later Hutchings's phone was within blocks of Thorne's auto-body shop in Clinton,
Maryland.  *Id*. at 24.  According to the government, the dots had been connected and, on October
24, 2019, both Appiah and Hutchings were indicted, each on a single count of conspiracy to
commit an offense or to defraud the United States.  Indictment at 1.

On October 28, 2019, Appiah was arrested in Georgia and was interviewed after he
purportedly waived his *Miranda* rights.  Gov't Mot. at 27.  He admitted knowing Hutchings and
purchasing firearms for him.  *Id*. at 27–28.  He explained that the two completed the transfer of
the firearms over the weekend of December 7, 2018.  *Id*. at 28.  Not only had he been selling
weapons to Hutchings, he confessed to selling weapons to other individuals as well.  *Id*.  In the
end, Appiah stated that he took "responsibility for [his] wrongdoing."  *Id.*  A search warrant
executed the same day at Appiah's Georgia residence turned up 3 pistols, 11 magazines, and
over 300 rounds of ammunition.  *Id*. at 28–29.

The next day, Hutchings was arrested at his Waldorf, Maryland residence.  Agents had
also procured a search warrant for his home that was executed the same day.  Pursuant to the
warrant, agents seized seven separate phones.  Gov't Notice of Discovery (Jan. 27, 2020), Ex. 1

("Jan. 27 Discovery Letter") at 2–3, ECF No. 32-1.  Hutchings and his fiancée, India Powell, also consented to the seizure of an additional four phones.  *Id*. at 3; Hr'g Tr. (Rough) at 5:18–20.

### B.  Text Messages At Issue

One of the phones the government obtained by consent during Hutchings's October 29 arrest and search, was India Powell's own iPhone.  Hr'g Tr. (Rough) at 9:2–7.  That phone "contained approximately 200 pages of digital messages between Hutchings, Thorne, and Powell."  Gov't Mot. at 30.  The text messages span the two-month period between November 2, 2018 and January 3, 2019 and are replete with discussion of Hutchings's relationships with Thorne and Appiah.  For instance, on November 2, 2018, Powell's phone received a message from a phone number associated with Hutchings saying "What should I do about this Unc shit." Gov't Mot., Ex. B at 1, ECF No. 47-2.[5]  Unc, the government explains, is a nickname Powell and Hutchings used for Thorne.  Gov't Mot. at 25 n.11.  Throughout the conversation that followed, Powell explained that Thorne had been contacting her expressing his hope that he, Powell, and Hutchings could, together, "fix" an apparent problem between them.  *Id*.  Thorne had been telling Powell that she and Hutchings may be in danger.  *Id*.  When she asked Hutchings what he thought about the situation, he replied "[k]ill or be killed and then at the same time feeling it ain't worth 30,000 for those kind of feelings."  *Id*. at 2.  The government intends to show that the "30,000" to which Hutchings referred is a debt Hutchings owed Thorne.  Gov't Mot. at 30–34. Powell expressed concern, and asked Hutchings "I mean honestly James how ruthless you think he is or whoever he say we may be in danger with?"  Gov't Mot., Ex. B at 3.  Hutchings explained that Thorne had his own debts, and that he had told Hutchings that "he owe his man

---

[5]     The government's exhibit's pagination begins at page 3.  To avoid confusion, when referring to this document, this opinion instead adopts the pagination assigned by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.

240,000." *Id*.  Hutchings fretted that Thorne may have told this other person that he could

collect at least part of that quarter of a million dollars from Hutchings directly.  *Id*.  In the end,

Hutchings told Powell that he was "fighting demons right now and definitely will make the right

decisions for mainly you and our kids regardless I will die for y'all and definitely would spend

the rest of my life in prison for y'all."  *Id*. at 13.

The conversation contains other references to Hutchings's debts.  On December 7, 2018,

the day Appiah traveled to Washington, D.C. with the guns that sparked this investigation,

Hutchings texted Powell, "Got to meet unc with some cash," and later, "My balance with kofi

[Appiah's first name] is $350 and my balance with unc is $500."  *Id*. at 162–63.

Moreover, the text messages contain evidence that Hutchings had access to Powell's

CashApp account, which the government alleges was used to transfer money to Appiah in

payment for the firearms at the center of this case.  Indictment at 8 ¶ d.  Indeed, the messages

show that Powell and Hutchings often discussed using Powell's CashApp to pay Hutchings's

various financial obligations.  *Id*. at 32, 92, 176.

Together, these messages are viewed by the government as powerful evidence confirming

the charged conspiracy between Hutchings and Appiah.

### C.    Relevant Procedural History

Initially, this matter was set for trial on July 27, 2020, with a hearing on the defendants'

potential motions to suppress on May 15, 2020.  Min. Order (Feb. 21, 2020).  Owing, however,

to the postponement of in-court proceedings caused by the outbreak of the COVID-19 pandemic,

*see In re: Further Extension of Postponed Court Proceedings in Standing Order 20-9 and

Limiting Court Operations in Exigent Circumstances Created by the Covid-19 Pandemic*,

Standing Order 20-29 ¶ 2 (postponing all "jury trials scheduled to commence before **August 1,**

**2020**" (emphasis in original)),[6] the trial in this matter is now set for November 9, 2020.  Notice of Hr'gs (May 26, 2020).  Nevertheless, the parties have begun to prepare for trial and have each filed several motions *in limine*.  On June 5, 2020, the Court held a hearing on a number of those motions, including the government's Motion Regarding Rule 404(b) and 609, Hutchings's motion to sever his co-defendant for purposes of trial, Def. James Hutchings's Mot. to Sever, ECF No. 48, and his motion to strike a small bit of text from the indictment, Def. James Hutchings's Mot. to Strike Prejudicial Surplusage or, Alternatively, to Partially Dismiss Count One, ECF No. 49.  *See* Min. Order (May 20, 2020).  Hutchings's Motion to Strike was denied for reasons stated in the hearing.  Hr'g Tr. (Rough) at 48–51.  Moreover, because the government and counsel for Appiah have indicated that Appiah plans to plead guilty prior to trial, the Court reserved ruling on Hutchings's motion to sever his co-defendant as potentially moot.  *Id*. at 52:9–15.  Finally, although at the June 5, 2020 hearing the parties discussed the contours of Hutchings's motion to suppress evidence obtained from his phone seized during Thorne's arrest, an evidentiary suppression hearing on that motion is scheduled for August 14, 2020, with a ruling likewise reserved for a later date.  *Id*. at 51:21–23.

Remaining pending before the Court, then, is the government's motion to admit evidence under both Federal Rules of Evidence 404(b) and 609.  The government submitted that motion on April 20, 2020, Hutchings submitted his opposition on May 4, 2020, Def.'s Opp'n, and the government submitted its reply on May 7, 2020, Gov't Reply Supp. Gov't Mot. ("Gov't Reply"), ECF No. 54.  Owing to the need for further clarification regarding a number of questions that arose at the June 5, 2020 hearing, the government submitted a supplemental notice on June 8, 2020, clarifying its positions and withdrawing part of its motion.  Gov't Supplemental Notice

---

[6]     Available at https://www.dcd.uscourts.gov/sites/dcd/files/COVID-19%20Standing%20Order%2020-29%20In%20Re%20further%20extensions%20of%20postponed%20court%20proceedings.pdf.

Based on the June 5, 2020 Mots. Hr'g ("Gov't Supplemental Not."), ECF No. 63.  On June 14, Hutchings replied to this supplemental filing, Def. James Hutchings's Surreply in Opp'n to the Gov't's Mot. Under Rule 609 ("Def.'s Surreply"), ECF No. 65, and the motion is now ripe for decision.

## II.     LEGAL STANDARD

The Supreme Court has recognized that, "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  Pretrial motions *in limine* help to ensure that, "[t]o the extent practicable," trials are conducted in a manner such that "inadmissible evidence is not suggested to the jury by any means." FED. R. EVID. 103(d).  They also aid courts in administering proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102.  Pretrial rulings like this one thus "may generally be the better practice, for [they] permit[] counsel to make . . . necessary strategic determinations" before the jurors are in their seats. *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

## III.    DISCUSSION

The government first seeks to admit text messages obtained from Powell's phone.[7] Defendant concedes that many of the messages are admissible, but asserts that admission of

---

[7]     Initially, the government also sought to admit several images of firearms recovered from another phone seized from Hutchings's residence during his arrest on October 29, 2019.  Gov't Mot. at 42–43.  The government asserted that these images would aid in showing "the defendant's knowledge of firearms and his prior intent to possess firearms."  Gov't Reply at 3.  As the Court pointed out at the June 5, 2020 hearing in this matter, however, the date stamps on those images show they were taken or otherwise put on the phone in question on July 30 and August 25, 2019, several months after the conspiracy alleged in the indictment.  Hr'g Tr. (Rough) 14:13–18; *see also* Gov't Mot., Exs. C, D.  Their probative value for showing Hutchings's "prior intent to possess firearms" was thus dubious.  In recognition of this fact, the government has since withdrawn its bid to admit those images.  Gov't Supplemental Not. ¶ 3.

others would violate Federal Rules of Evidence 403 and 404(b).[8]  Next, in the event that

Hutchings testifies at trial, the government seeks a ruling that evidence of two of his prior

convictions will be admissible under Federal Rule of Evidence 609 in order to impeach his

credibility.  Gov't Mot. at 46–47.  Hutchings opposes this motion as well, contending that

admission of this evidence is likewise improper.  Following a review of the principles underlying

the applicable Federal Rules of Evidence, the parties' arguments are addressed.

### A.      Applicable Legal Principles

#### 1.      *Rule 404(b)*

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to

prove a person's character in order to show that on a particular occasion the person acted in

accordance with the character."  FED. R. EVID. 404(b)(1).  So-called "propensity" evidence is

excluded not because it is irrelevant, but because "it is said to weigh too much with the jury and

to so overpersuade them as to prejudge one with a bad general record and deny him a fair

opportunity to defend against a particular charge."  *Michelson v. United States*, 335 U.S. 469,

475–76 (1948).  Rule 404(b) thus attempts to head off the risk that, presented with such evidence

of a defendant's uncharged bad conduct, "a jury [might] convict for crimes other than those

charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves

punishment."  *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v.
Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)).  Nevertheless, although such propensity evidence may

not be used to "prov[e] that a person's actions conformed to his character," *United States v.*

---

[8]      The government's motion also references evidence concerning Appiah.  Specifically, the government seeks
to admit evidence that Appiah was not only selling firearms to Hutchings, but also to other individuals in Georgia
and Alabama "and tried to bring firearms to D.C. even after being interviewed by law enforcement."  Gov't Mot. at
41.  As noted, Appiah intends to plead prior to trial and so has mounted no opposition to this motion.  Hr'g Tr.
(Rough) at 4:25–5:1.  Thus, as Appiah's counsel conceded at the June 5, 2020 hearing, the government's motion is
granted as to Appiah.  Hr'g Tr. (Rough) at 5:1–3 (Appiah's counsel stating "there is not any reason [the motion]
shouldn't be treated as conceded" as to Appiah).

*Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc), it may be used for other purposes,

"such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

mistake, or lack of accident," FED. R. EVID. 404(b)(2).  "In other words, under Rule 404(b), any

purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is

not offered solely to prove character."  *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir.

1990).  As the rule merely prohibits evidence of a defendant's other acts "in but one

circumstance," the D.C. Circuit has characterized it as "a rule of inclusion rather than exclusion."

*United States v. Machado-Erazo*, 901 F.3d 326, 333 (D.C. Cir. 2018) (first quoting *Crowder*, 141

F.3d at 1206 and then quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).

      **2.**     ***Rule 403***

That evidence withstands scrutiny under Federal Rule of Evidence 404(b) does not mean

it must be admitted, however, as it may nonetheless be excludable under Federal Rule of

Evidence 403.  That rule explains that "[t]he court may exclude relevant evidence if its probative

value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." FED. R. EVID. 403.  Notably, Rule 403 renders relevant evidence

inadmissible only upon a showing that it presents a risk of "unfair prejudice," i.e. prejudice that

is "compelling or unique," *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995) (quoting

*United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992)), or has "an undue tendency

to suggest decision on an improper basis," *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir.

2013) (quoting FED. R. EVID. 403, Advisory Committee's Note to 1972 Proposed Rules).

Moreover, the danger of any potential unfair prejudice must substantially outweigh the

evidence's probative value in order to exclude evidence under Rule 403.

In undertaking the 403 analysis, the district court must "take account of the full evidentiary context of the case as the court understands it when the ruling must be made." *Old Chief*, 519 U.S. at 182.  A calculation of the probative value and risk of prejudice is thus "affected by the scarcity or abundance of other evidence on the same point." *Id.* at 185 (quoting 22 C. WRIGHT & K. GRAHAM, FED. PRACTICE AND PROCEDURE § 5250, 546–47 (1978)).  That is, when there is "less risky alternative proof going to the same point," the probative value of evidence that presents a greater danger of unfair prejudice may be "discount[ed]." *Id.* at 183.  Given the trial court's familiarity with this full evidentiary context, district judges generally have "broad discretion to weigh the extent of potential prejudice against the probative force of relevant evidence." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 633 (D.C. Cir. 2010) (quoting *Fredrick v. District of Columbia*, 254 F.3d 156, 159 (D.C. Cir. 2001)).

### 3. *Rule 609*

The admission of prior convictions for the purpose of impeaching a defendant witness is governed by Federal Rule of Evidence 609(a).  When, in a criminal case, the government wishes to attack a testifying defendant's "character for truthfulness," that rule provides that any prior conviction occurring within 10 years, "must be admitted" (1) automatically, if it requires proof of a dishonest act or false statement, FED. R. EVID. 609(a)(2); and, (2) with respect to felonies that do not require such proof, whenever "the probative value of the evidence outweighs its prejudicial effect to [the] defendant," FED. R. EVID. 609(a)(1)(B).  Convictions over 10 years-old are admissible under the rule "only if" their "probative value, supported by specific facts and circumstances, substantially outweighs [their] prejudicial effect." FED. R. EVID. 609(b).

In weighing the probative value and prejudicial effect of past convictions, only the extent to which the conviction is probative of the defendant's credibility is relevant to the inquiry. *See United States v. Lipscomb*, 702 F.2d 1049, 1057 (D.C. Cir. 1983).  As the Circuit has explained,

however, Rule 609 reflects Congress's belief "that all felonies have some probative value on the issue of credibility." *Id*. at 1062. Nevertheless, the rule's far more stringent admissibility standard for convictions over ten years-old shows that a felony's probative value diminishes with time. Indeed, "many 9-year-old convictions are only slightly probative." *Id*. In this District, a variety of factors have been found relevant to determining whether the probative value of a particular conviction outweighs its prejudicial effect, including "(1) the kind of crime involved; (2) when the conviction occurred; (3) the importance of the witness' testimony to the case; (4) the importance of the credibility of the defendant; and (5) generally, the impeachment value of the prior crime." *United States v. Anderson*, 174 F. Supp. 3d 104, 106 (D.D.C. 2016) (quoting *United States v. Knight*, No. 07-81, 2007 WL 1760939, at *3 (D.D.C. June 18, 2007)). Those factors are not compelled by the text of the rule, nor are they exhaustive of the possible considerations in determining the admissibility of the evidence.

### B.    The Text Messages On Powell's Phone Are Admissible

The government seeks to admit many of the text messages between Hutchings and his fiancée for four reasons: (1) to "showcase the connection between Hutchings and Thorne and also help[] digitally connect Appiah, Hutchings, and Thorne in a meaningful way," Gov't Mot. at 43; (2) to show the "tension" between Hutchings and Thorne regarding an "overwhelming debt owed by Hutchings to Thorne," *id*.; (3) to establish a nexus between Hutchings and his fiancée's CashApp account, *id*. at 44; and (4) to "illustrate[] Hutchings's debt to Appiah for the firearms," *id*. The government included these messages in its motion to admit evidence under Rule 404(b) only out of an abundance of caution, as, "from [its] perspective," the messages do "not constitute Rule 404(b) evidence," but rather are "contemporaneous evidence that is inextricably intertwined with the nature of the conspiracy." *Id*. at 43. In other words, according to the government, the

acts evidenced by the messages it seeks to admit are not "other act[s]," as contemplated by Rule 404(b), but instead are part and parcel of the alleged offense itself. FED. R. EVID. 404(b).

The government's argument draws on a long line of D.C. Circuit precedent explaining that "a threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes." *Machado-Erazo*, 901 F.3d at 333. The law is clear that "[a]cts 'extrinsic' to the crime charged are subject to Rule 404(b)'s limitations" while "acts 'intrinsic' to the crimes are not." *Id*. at 333–34 (citing *Bowie*, 232 F.3d at 927). When determining which acts are extrinsic and which are intrinsic, the conspiracy context of this case is important. "In conspiracy prosecutions, the prosecution is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed." *Id*. at 334 (internal quotation marks omitted) (alteration in original) (quoting *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000), itself quoting *United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir. 2000)). For instance, acts intrinsic to a conspiracy may include evidence of acts "link[ing] a defendant to other defendants," "show[ing] the nature of a conspiracy and the kind of organizational control a defendant exercised," and "show[ing] the defendants' intent to act in concert." *Id*. (internal quotation marks and citations omitted). The government asserts that the text messages are precisely this kind of evidence and, therefore, are not subject to Rule 404(b) at all.

Hutchings puts up little resistance to this argument. Indeed, he cites only one case in arguing that his text messages with Powell are not intrinsic to the alleged conspiracy. Def.'s Opp'n at 2 (citing *United States v. Bell*, 795 F.3d 88 (D.C. Cir. 2015)). Although *Bell* states that

"evidence is not generally rendered *intrinsic* simply because it completes the story or explains

the circumstances behind a charged offense," *Bell*, 795 F.3d at 100 (emphasis in original),

Hutchings fails to grapple with *Bell*'s far more specific directive that "[i]t is well-established

that" other acts evidence "is admissible to establish the 'contours of [a] conspiracy,'" *id.*

(alteration in original) (quoting *United States v. Graham*, 83 F.3d 1466, 1473 (D.C. Cir. 1996)).

The text messages the government seeks to admit do just that.  Hutchings's conversations with

his fiancée about the debt he purportedly owed Thorne and the enormous pressure on him to get

out from under it are powerful evidence of the connection between Hutchings and Thorne and

help explain why Hutchings was providing guns to Thorne.  Put another way, this evidence

explains the existence and origins of the alleged conspiracy.  These text messages also provide a

direct connection between Hutchings and Appiah, as Hutchings explicitly references a debt he

owes someone named "[K]ofi."  Gov't Mot., Ex. B at 163.  Moreover, the messages offer insight

into the methods by which the alleged conspiracy was carried out, as they include several

references to Powell's CashApp account, which, according to the government, was the very

account used to pay Appiah for the firearms at issue in this case.  These messages thus doubtless

"link a defendant to other defendants," "show the nature of [the] conspiracy" including its

organization, and certainly are indicative of the "defendants' intent to act in concert."  *Machado-

Erazo*, 901 F.3d at 334.  The messages are thus not "subject to Rule 404(b)'s limitations."  *Id.*

Notably, even if subject to Rule 404(b), Hutchings concedes that many of the text

messages would be admissible as evidence of his motive and intent.  Def.'s Opp'n at 8 ("The

defense agrees that, under the plain language of Rule 404(b), evidence of motive is not excluded

by Rule 404(b) and that evidence of a debt owed to Thorne by Hutchings during the relevant

timeframe would be admissible for this purpose . . . ."); *id.* (explaining that "evidence of a

17

specific debt owed by Hutchings to Thorne and Appiah during the relevant timeframe" is also admissible "as evidence of intent"). This concession was wise as the D.C. Circuit recently "explained" that "[i]ntent and knowledge are . . . well-established non-propensity purposes for admitting evidence of prior crimes or acts." *United States v. Han*, — F.3d —, 2020 WL 3393445, at *2 (D.C. Cir.). Moreover, the evidence would not otherwise be barred by Rule 403 as there is nothing untoward about having a debt and nothing in the text messages indicates that the debt is the result of illegal activity. To the extent the text messages produce any prejudice at all, it certainly does not *substantially* outweigh the probative value of the evidence in question.

Leaving the realm of Rule 404(b) behind, Hutchings contends that many of the messages contained in the 200-page text message chain between Hutchings and Powell "are not germane to the conspiracy and are unfairly prejudicial," as they contain discussions of "sports betting, gift cards, details of family and romantic life[,] . . . medical appointments" and other irrelevant minutiae of everyday life. Def.'s Opp'n at 8. He argues that the government should thus be "limited to just the one or two texts necessary to establish [his] financial motivation." *Id*. True enough, many of the text messages are irrelevant to the charged conspiracy. As the government rightly notes, however, it has no obligation to specifically identify which of the messages it intends to introduce. Gov't Reply at 3–4 (citing *Bowie*, 232 F.3d at 926). At the same time, the government has offered to work with Hutchings to "redact or otherwise cull down irrelevant messages," *id*. at 4, and the Court expects counsel to confer with this goal in mind. Should that conferral process reach an impasse, Hutchings, who has had the text messages in his possession for several months now, may file a motion to exclude any evidence to which he objects. In any event, to the extent defendant believes that a particular text message is irrelevant, unnecessarily cumulative, or otherwise prejudicial, he is free to object to its admission at trial. *See* FED. R.

EVID. 402 ("Irrelevant evidence is not admissible"); FED. R. EVID. 403 ("The court may exclude

relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting

time, or needlessly presenting cumulative evidence.").

Hutchings final attack on the admissibility of the text messages zeroes in on the

government's attempt to tie Hutchings to Powell's CashApp account.  He contends that the

government "should not be able to use the text messages in its exhibit" to support the argument

"that Hutchings is responsible for Powell's CashApp payments to Appiah."  Def.'s Opp'n at 8.

He asserts that "[d]oing so would sow confusion in the jury," *id.*, in an apparent reference to

Rule 403's statement that a court "may exclude relevant evidence if its probative value is

substantially outweighed by a danger of . . . confusing the issues, [or] misleading the jury," FED.

R. EVID. 403.  In particular, Hutchings notes that the discussions of CashApp in the text message

chain "do not indicate that Powell's CashApp account [was] being used by Hutchings, much less

for an illicit purpose."  Def.'s Opp'n at 8.

The text messages, however, do indicate that Hutchings and Powell often coordinated

how money from Powell's CashApp account would be used.  For instance, in one exchange,

Powell tells Hutchings that she is on her way to "deposit[] the money" and Hutchings responds

"Ok how much is it?"  Gov't Mot., Ex. B at 91.  She tells him that she has "$500 in cash" and

"$110 on cash app."  *Id.* at 92.  Although messages of this kind may not conclusively establish

that Hutchings directed Powell to make disbursements from her CashApp account, they are

doubtless powerful evidence that he was aware of the account and aware of the transactions

Powell conducted through the account.  This evidence is thus highly probative of the notion that

when Powell sent money to Appiah, Hutchings knew of and indeed coordinated the transaction.

Moreover, any risk of confusing the jury is minimal at best.  Jurors will easily understand the

chain of logic this evidence is intended to complete: because Hutchings knew of and often coordinated transactions into and out of Powell's CashApp account, any payments to Appiah from that account may have been at his direction, or, at the very least, with his knowledge.

Rule 404(b) does not apply to the text messages between Powell and Hutchings as they are intrinsic to the alleged conspiracy and Hutchings has failed to demonstrate why Rule 403 would bar their admission. The government's motion to admit the text messages derived from Powell's phone is thus granted.

### C.    Hutchings's Prior Convictions

The government's motion next turns to its plan to admit evidence of two of Hutchings's prior convictions. In particular the government plans to admit evidence of Hutchings's 2012 conviction in Alexandria, Virginia for multiple offenses, including conspiracy to violate racketeering provisions, distribution of marijuana, transportation to Virginia of over 5 pounds of marijuana, and money laundering, along with his 2013 conviction for a marijuana and drug paraphernalia offense in Prescott, Arizona. Gov't Mot. at 45–46.

The June 5, 2020 hearing in this matter highlighted some confusion concerning how and for what purpose the government intended to admit these convictions. Initially, the government represented, consistent with its moving papers, that it did not intend to admit evidence of Hutchings's convictions in its case-in-chief, but sought to use the convictions only to impeach his credibility should he elect to testify. Hr'g Tr. (Rough) at 18:2–5; Gov't Mot. at 44 ("[T]he government respectfully submits that certain of [Hutchings's] convictions are admissible *for impeachment purposes*" (emphasis added)). Yet, the fact that Hutchings had previously been convicted of a felony is central to the government's case. Notably, the government's indictment explains that the "goal of the conspiracy was to obtain firearms from licensed firearms dealers in Georgia" and to "transport [those] firearms to the District of Columbia and elsewhere, for the

purpose of illegally reselling [those] firearms for profit to individuals *otherwise unable to legally acquire firearms.*"  Indictment at 2 (emphasis added).  One class of individuals who are "unable to legally acquire firearms," *id.*, is, of course, individuals who have "been convicted" of "a crime punishable by imprisonment for a term exceeding one year," *i.e.* a felony, 18 U.S.C. § 922(g)(1). Indeed, the government took pains to note in the indictment that Hutchings "is . . . a person previously convicted of multiple crimes punishable by a term of imprisonment exceeding one year and had knowledge of that fact (at least as of November of 2018)."  Indictment at 5 ¶ b. When pressed about how exactly the government planned to show that the goal of the conspiracy was to put weapons in the hands of ineligible individuals if it had no intention of introducing direct evidence of Hutchings's ineligibility to possess weapons in its case-in-chief, government counsel explained that the government intended to prove that aspect of the conspiracy "based upon the circumstance in which Mr. Hutchings and Mr. Thorne were together," and "the discussions between Mr. Appiah, as well as Mr. Hutchings on Mr. Hutchings'[s] cell phone." Hr'g Tr. (Rough) at 21:6–11.

As the hearing proceeded, however, the government modified its response, explaining that it had not sought to admit the evidence of Hutchings's prior convictions under Rule 404(b), the usual route for the government to get prior convictions admitted in its case-in-chief, *see United States v. Rogers*, 918 F.2d 207, 211 (D.C. Cir. 1990) (recognizing the distinct domains of Rules 404(b) and 609 and refusing the "invitation to conflate them"), because Hutchings's prior convictions were "intrinsic to the conspiracy," Hr'g Tr. (Rough) at 28:10–13.  Government counsel clarified that while it intended to "introduce the fact that [Hutchings] has a prior felony conviction and he is ineligible" to possess firearms in its case-in-chief, the government did not

intend to present evidence of the specifics of the prior convictions unless Hutchings testified. *Id*. at 30:20–25.

In light of the clarification that the government did intend to introduce the fact of Hutchings's prior felony convictions in its case-in-chief, the parties were allowed additional time to submit briefing about that fact's impact on the government's Rule 609 motion. *Id*. at 36:16–18.  In supplemental briefing, the government stated unequivocally that "as the indictment specifically avers that one of the objects of the conspiracy was to unlawfully traffic firearms to prohibited persons, the government does seek to introduce the fact of defendant[] Hutchings's prior felony convictions (if not by stipulation, than merely by the prior, certified convictions or related transcripts) to show that he was also a prohibited person" and expressed the government's belief that these convictions were "intrinsic proof of one of the objects of the charged conspiracy."  Gov't Supplemental Not. ¶ 4.  Hutchings, in his supplemental briefing, also noted that he "will stipulate to the fact that he has a prior felony conviction," though the exact contours of that stipulation remain unknown.  Def.'s Surreply at 1.

With more clarity, the prior convictions' probative value with respect to Hutchings's character for truthfulness and their potential prejudicial effect can be weighed with greater accuracy.  As felony convictions less than 10 years-old, they "must be admitted" if their "probative value . . . outweighs [their] prejudicial effect to" Hutchings.  FED. R. EVID. 609(a)(1)(B).  Hutchings contends that the age of the convictions—one is 6.5 years-old, the other 8—seriously undermines their probative value, pointing out that these convictions are nearing the 10-year mark, at which convictions face a far higher bar to admissibility, and are thus on their "last legs."  Def.'s Opp'n at 9.  This argument misses the mark.  Although the age of a conviction certainly impacts its probative value, both convictions are still well within the class of

convictions that are not subject to the more stringent Rule 609 test.  Instead, both of these convictions arise from a scheme to transport hundreds of thousands of dollars-worth of marijuana across the country.  Gov't Reply at 6; Hr'g Tr. (Rough) at 26:20–25 (government counsel explaining that the Arizona and Virginia convictions were "related").  These are "serious crime[s] that show[] conscious disregard" for the law and thus "reflect[] more strongly on credibility."  *Lipscomb*, 702 F.2d at 1071.  Moreover, to the extent that Hutchings testifies that he lacks experience with the interstate transport of contraband or serving as the middle-man brokering transactions involving contraband, these convictions will be highly probative of his character for truthfulness.

Hutchings next sets his sights on the other side of the 609 equation, asserting that introduction of his prior convictions carries a serious risk of prejudice.  He does not identify the precise nature of that potential prejudice, beyond stating generally that "[w]hen the defendant is impeached by a prior conviction, the question of prejudice, as Congress well knew, is not *if*, but how much."  Def.'s Opp'n at 9 (quoting *Lipscomb*, 702 F.2d at 1062).  While that may be true, Rule 609 simultaneously embodies Congress's "belie[f] that all felonies have some probative value on the issue of credibility."  *Lipscomb*, 702 F.2d at 1062.  The risk of prejudice, furthermore, is not as acute as it might be.  While courts have been particularly concerned with the prejudicial effect of admitting convictions that are similar or identical to the offenses underlying the charges in the instant case for fear of inviting the jury to think "if he did it before he probably did so this time," *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967), the alleged offense in this case does not match the convictions the government seeks to admit.

The risk of prejudice is further diminished in this case because, as the government has now made clear, the fact of Hutchings's prior felonies will be a part of the its case-in-chief.[9] Courts have typically held that when a jury is already privy to a defendant's prior conviction owing to its introduction in the government's case, the later repetition of that evidence for impeachment purposes poses only a "negligible" risk. *United States v. Moore*, 75 F. Supp. 3d 444, 456 (D.D.C. 2014) (quoting *United States v. Chauncey*, 420 F.3d 864, 874 (8th Cir. 2005); and citing *United States v. Lattner*, 385 F.3d 947, 961 (6th Cir. 2004) and *United States v. Mahler*, 579 F.2d 730, 736 (2d Cir. 1978)).  Although the government has indicated that, should it elect to impeach defendant Hutchings, it will go into further detail about the convictions than it plans to in its case-in-chief, Hr'g Tr. (Rough) at 30:20–23, any increase in the amount of prejudice defendant will face because the jury knows slightly more about his convictions will be marginal.

Finally, Hutchings asserts that his "testimony will be indispensable to the defense, since he alone can explain away the weight of the government's case." Def.'s Opp'n at 10.  He argues that the risk of dissuading his testimony posed by the threatened admission of these convictions is too great. *Id.*  This argument is, however, somewhat undermined by Hutchings's apparent willingness to stipulate to his past convictions.  Def.'s Surreply at 1.  In any event, the centrality of Hutchings's testimony also means that his credibility will be of utmost importance.  Any possible prejudicial effect must therefore be balanced against the jury's need to carefully weigh Hutchings's credibility.  The importance of his testimony does not provide any cause to bar the government from inquiring about his past convictions during cross-examination.

---

[9]  Moreover, as Hutchings indicates, there has been a "sea change in public attitudes towards marijuana as a substance, which has resulted in decriminalization in many jurisdictions," Def.'s Opp'n at 9, which further mitigates the prejudice from the two prior convictions.

**IV.     CONCLUSION**

The government's Motion Regarding Rule 404(b) and 609, as modified by its later

filings, is granted.  Specifically, the government may admit the text messages between Hutchings

and Powell recovered from Powell's phone and, in the event that Hutchings testifies, the

government may introduce evidence of his 2012 and 2013 convictions in order to "attack[] [his]

character for truthfulness."  FED. R. EVID. 609(a).

An appropriate Order accompanies this Memorandum Opinion.

Date:  June 25, 2020

_____
BERYL A. HOWELL
Chief Judge